Thank you, Your Honor. May it please the Court, I'm Mario Garcia with the law firm of Bratman X Garcia in Indianapolis. I represent Jeffrey Rothbard. Mr. Rothbard is seeking a stay of his sentence pursuant to Federal Rule Criminal Procedure 38 and 18 U.S.C. 3143b. This is an exceptional and unique situation before the Court. Jeff suffers from a rare and life-threatening disease that is imatinib-resistant. Actually, we all do. Old age is what it's called. We understand he has a very serious disease. I have a question for you about this letter from the DOP, the letter from Mr. Harvey. And actually, depending on what you say, we'll also want the government to comment on this. On page 3 of the letter, in the final paragraph, it's discussing how a medical provider might get a non-formulary request. Because obviously, the nilotinib is not in the formulary. And it says, medical providers may submit a non-formulary request and prescribe the requested medication pending approval of the request. And so what I want to know is, if the doctor says, I think this man needs nilotinib, he gets it until the process is over? Is that what you think this means? That's what it looks like to me. And prescribe the requested medication pending approval. Where are you reading? It's right here. It's page 3 of the Harvey letter. This here? Yeah, right here. I missed it. Sorry. So, I mean, that makes a big difference to me because one of the things that you were concerned about, which is certainly understandable, is some long bureaucratic process before he would be able to get the drug that he needs. But the question is, what happens in the middle? Is he getting it until they say no? Or is he not going to get it until they say yes? Well, it's a good question. And that's part of the unknown which causes us so much concern. Because I don't believe he says he will get it. He says, when this happens, here's the process that the Bureau of Prisons goes through. Here's my issue with that. I mean, I totally understand. For this man, there's a lot of evidence that he needs this particular drug. But a world in which the prison doctors have no discretion over the drugs doesn't seem sensible to me either. If some prisoner thinks he needs OxyContin and the prison thinks, no, you really don't. You can make it with Ibuprofen or something. There's got to be some cognition going on in the prison. So I'm not quite sure. I understand what you would like is kind of a guarantee, I guess, that he's going to get this. But I don't know that that's the way it usually works. Well, I guess what we'd like is the court to recognize that there's no harm in allowing Mr. Rothbard to stay out pending appeal. Because there's a chance that this court may determine after review that his sentence was unreasonable. And so not only will he have gone into the Bureau of Prisons facing the possibility that he can't get the drug or they determine that he's not entitled to the drug, but he also may have started to serve a sentence in prison rather than, for example, as probation recommended, a halfway house in home detention. So there's really, when you balance the equities, there's a lot more harm sending him to prison now while the appeal pens versus allowing this appellate process to continue and issuing the stay. What does this sentence mean in the paragraph that Judge Wood was reading from? If the medication is not included on the national formulary, medical providers may submit a non-formulary request and prescribe the requested medication pending approval of the request. Does that mean that the provider may issue a prescription that is not, however, usable until the request has been approved? That's exactly how I read it, and that's what causes us the concern. That's the problem. So even though there's a prescription, it can't be filled until the decision has been made. The Bureau of Prisons. Exactly. So in your view, of what weight is the assessment of the likelihood of success on appeal? If you look at the traditional criteria under the statute, that's certainly a factor. What if we thought, I mean, of course, if we thought there was a huge chance of success, that would be a strong reason for somebody who's not at risk to be left outside of prison. But if it was thought to be a very long shot, isn't it a little different? It is. And, again, I think the record supports the fact that perhaps the sentence of 24 months in the Bureau of Prisons was unreasonable. And we believe that there's a likelihood, after the court considers all of the briefs, that it may, in fact, determine that the court got it wrong. And sometimes the district courts get it wrong. But what arguments for an unreasonable sentence, other than the fact that this is a person whose health is very bad, in terms of the nature of the offense and deterrence and all these other usual factors? Sure. So we believe that when the court reviews the 3553A analysis, it will find that we've got a nonviolent offender, that we've got someone who does suffer from this serious medical condition, which is a fact and circumstance that under 3553A the court should take serious consideration. But who committed this offense while he was on probation for a comparable offense. And I acknowledge that and agree with that. However, I think, again, when you balance that versus the other conditions, perhaps a sentence outside of the Bureau of Prisons, but still for 24 months, is more reasonable than sending him to prison for the 24 months. Well, when was the last time, was there something about two and a half years that he hasn't reoffended? Yeah, thank you, Your Honor. He has been on pretrial release now for over two and a half years. I think it's approaching three years, with no violations. Judge Young found that he was not a flight risk, and the government did not disagree. He's not a flight risk. He is not a danger to the community. He is gainfully employed. And since his conviction, he's made restitution payments. So I think those things are all in his favor. And waiting another six or nine months while this court determines whether or not it's going to remand the case doesn't harm anyone. The government isn't no less off allowing for six or nine months to let this process proceed. And then if it decides that he's not going to- Wait, where does the nine months come from? I'm looking at the average length approximately left from now while this appellate process proceeds. We're ready to file our brief very quickly. We did obtain an extension, but we are in a final draft of our brief, and I expect to file it sometime in the next seven days. The brief should be in by mid-March, which suggests that this court would have it on an oral argument docket by April. We're very up to date on that sort of thing. Yes, I know. The court's very efficient. And so then the court may take another four or five- When are you expecting to file your brief? Within the next seven days. Within the next- Seven days. Seven days. I don't know why it should take to March. I'm sorry? I don't understand why the process should go to March. Well, then the appellate will file their brief, and they'll do a reply brief. That's what gets us into- Yeah, we'll give them seven days to each of them, right? We could tighten it up. We could tighten it up for sure. We have no problem doing that. It is a relatively short record. So I see I'm entering into my time for rebuttal. I think I've made our points. Again, when you look on balance, I don't think there's any harm in allowing this stay to continue. I don't think the government can point to any harm other than its desire that Mr. Rothbard start serving his sentence immediately, and we don't think that on equity that that's the most appropriate resolution for Mr. Rothbard. Thank you. All right. Thank you, Mr. Garcia. Mr. Shepard. Thank you, Your Honor. And Mr. Shepard, if you could begin with a combined answer to Judge Posner's question of mine, what does this sentence mean? Does it mean you write a prescription, but it never gets filled until there's an approval, or does it mean that pending approval, the non-formulary drug can be used by the person? I don't know for certain. I don't think that- Why don't you know for certain? You ought to know for certain. Possibly, Your Honor, the next sentence alleviates any concern as to the question specifically that when the medical equivalent medication would not be clinically appropriate, this approval process for the non-formulary medication can be expedited and approval generally occurs within 24 hours of receiving the request. So if it's a 24-hour turnaround, then that's not very much. Approval or denial, I guess. Approval slash denial, that's what that says. I couldn't read it on this reproduction. And approval slash denial. In other words, a ruling on the request occurs within 24 hours after receiving the request in the central office. That's correct. So I'm not- Is there any way that this could be resolved? I mean, I don't understand why we have to sit here guessing about what BOP is going to do. It can't be resolved, Your Honor, because he hasn't gone to the prison and been evaluated by the- He did what? He has not appeared, checked into the prison, and been evaluated by the prison staff. But why is that so? I mean, there's a medical record here, and it's a little bothersome to think, you know, you've got the Department of Justice wearing one hat that you're wearing right now, that of prosecutor, and then there's another part of the Department of Justice, the Bureau of Prisons, that says, oh, you know, we're not going to even facilitate letting Mr. Rothbard be evaluated so that we can make sure there's no deleterious break in his medication. It seems a little weird that we have to decide this without some kind of sensible middle ground. Well, maybe in this one instance it is, but I think when you look at all the inmates who are coming into the Bureau of Prisons from around the country, all with varying- Well, and a lot of them are certainly, they don't even have prescriptions for things that are not in the formulary. It's a pretty decent formulary. But there are a few people, and the government's not contesting, that this man's illness is potentially fatal if he goes off the medication and he's not in remission anymore. Well, certainly we're not contesting- Have your cake and eat it, too, right? What was that? I'm sorry. I said you could have your cake and eat it, too. Just get him evaluated at Butner someplace. Well, he was, in fact, designated to Butner. Bureau of Prisons can designate at any place. Any place they want. Yeah, I don't care where they designate. But, you know, to get this done in some way so that instead of putting him at risk of somebody sitting around for weeks while they meditate on whether he should get his nalodnib, you know, just find out. Look at the records. Evaluate him. I can't believe it's all that difficult. What I can say is that's not the way the BOP does it. Whether or not that's a good answer, I don't know. That is the answer. No, that's a good answer. They're enjoinable. I am certain that, and I believe that Mr. Garcia has even indicated, they provided the records to the BOP as part of their process. I am certain that is what went into his designation to a FCI. Excuse me, an FMC, FMC Butner. I'm sorry. That's what went into his designation is going to FMC Butner, which is the highest level care center. The Bureau of Prisons has one of six throughout the country. It's essentially a hospital where he can be provided the care that he apparently needs. Is that clear, that he's going to go to Butner? What's that, Your Honor? Is it clear that that's where he'll go? That is where he was designated to go before this stay went into place. He had a report date, and he was designated to FMC Butner. Yes, it was, Your Honor. Okay. Where is he now? He's right there. Why do you have him examined by a hospital in Chicago? I don't think the Bureau of Prisons would recognize. I don't know how that would have any— What does that mean, the Bureau of Prisons? The Bureau of Prisons doesn't recognize what highly reputable hospitals decide about a person's need for a drug. The Bureau of Prisons is some special repository of medical knowledge? Why should the Bureau of Prisons have to rely on something else? Well, to move this thing along, for one thing. Well, wouldn't it be the same thing by evaluating under their own doctors, under one of their six specific hospitals, which is what they are doing on how they designated him? I don't understand why he can't do that as an outpatient. I mean, that's why I'm—I mean, you seem to think in order to have him evaluated at Butner, he's got to report and that it's impossible for him to just go to Butner or, for that matter, Lexington or any of these other places and be evaluated on what I'm going to just call roughly an outpatient basis so that while his appeal is appending, an answer to this question can be come to. I don't know if they could or they couldn't. I know they don't. I also would just, as I'm coming— That's such a bad—I mean, you know, it's an unsatisfactory answer in that it creates a problem where there might not need to be one. But nothing that we are looking at is what the law seems to say or the test. The test specifically that we're supposed to look at is, is there a substantial question that the sentence will be overturned? And in order to do that, the defense has to point to some sort of—we're only talking about that one prong. Has the defense pointed to anything the district court did wrong? They haven't alleged a wrong calculation. They haven't alleged a factual error. No, it's just a discretionary thing. They're just alleging 3553A. They are disagreeing with the 3553A analysis which was done by the district court. So what if we just really expedited this? His brief is coming in in a week. We told you to file a brief seven days later. We get a reply brief four days after that, and we just pop it on an argument calendar and resolve the whole thing. Your Honor, again, I don't think that that's—I think that sends the wrong message. Why? I mean— Because it ignores the—it essentially— Why do you need a lot of time for this case to write a brief? I don't know that we do. I know that my own particular trial calendar, I have two trials on February 6th. I have two trials on March 6th. So trying to fit that in with that trial prep is going to be difficult. I also just think that that sends the wrong message to district courts. But isn't the immediate subject whether he should be getting this nilotinib? According to them, it is. It's just a medical question. The immediate subject is— It should be very easy to resolve. The immediate question is can the Bureau of Prisons give him accurate and equivalent care? Well, is there an equivalent? Wait a second. What does that mean, adequate and equivalent care? Are you talking about a substitute for nilotinib? What I'm talking about is— Are you talking about a substitute for nilotinib? I'm talking about— Would you answer my question? I'm trying. No, you're not. I'm asking you a simple question. Is this about finding a substitute? I think it would be okay if we let it go. Would you let me finish, please? I don't know. You won't let anybody else finish. I don't know why— I want to get his answer to a simple question. Okay. Ask the question. You'll give an answer. Which is simply, if you'll let me finish, is simply is the issue here whether there's a substitute for nilotinib that the prison system is interested in exploring. Is that what we're talking about? No. Well, if we all agree that he needs the nilotinib, doesn't that eliminate every issue? I don't know that we're agreeing that he needs it. And that's different than is there a substitute. Excuse me? I don't know. Wait. I don't understand. You think there may be a substitute? I don't know. What I know is that the— which is equally good. Maybe it's cheaper. Is that what the Bureau of Prisons is interested in? It's a sub-issue. I think what they are interested in is can they provide the care that he needs. I know. But can that involve a substitute for nilotinib, which will cost the Bureau of Prisons less than $22,000 a month? If they in their medical capacity believe that and try it, then yes. That's one of the things. You're essentially taking Dr. Cripes' evaluation as the gospel. That's one of the things about the defendant's motion that you have to accept. I don't know that that's necessarily the case. I'm not a medical professional.  But Dr. Harvey in the BOP— None of us are. Go ahead. What was that, Your Honor? I say none of us are. The BOP has to look at him and determine. And if they determine that yes, that is exactly what he needs, as Dr. Harvey stated— So they're looking for a cheaper substitute. They are looking for the way in which to care him. They're looking for a cheaper alternative. I don't think that we can make that conclusion. Well, the nilotinib is standard. What was that, Your Honor? It's the standard treatment for his particular condition. Actually, there were three that were posited by his expert. I know there's a succession, but the nilotinib is critical. And I'm just—I'm worried that the Bureau of Prisons wants a cheaper alternative. They don't want to have their bosses, what, spending $22,000 a month on a drug for this guy? That may be the case. I would state that the taxpayers are essentially already paying $22,000. If you'll notice, his benefit statement was NDYs. That's a Medicaid program throughout. It's the managed care Medicaid from Indiana. So all we would be doing in relation specifically as to the cost— But the Bureau of Prisons has— —shifting the check from HHS to BOP. The Bureau of Prisons has a budget. Yes, they do. I don't know whether it's a generous budget or a cheap budget or what. But I'm concerned the Bureau of Prisons may be worried about its budget and looking for a cheaper—a cheap substitute for nilotinib. That's what bothers me. I'm out of time. If the Court's permission, I'd respond to that otherwise. Please. Of course. I think that that would unfairly—  —put a cost determination above the health of one of its patients. No, I don't think it would be the medical— And I don't think that they're going to do that. I do not think it would be the medical people at all. There are people on top of the medical people. According to the letter, it's the medical professionals who would be making the determinations of what drugs are necessary. And there's an expedited procedure in place to get it to them if that's what they determine is necessary. And for all those reasons, I don't believe he's met his burden. The defense has not shown that there's a substantial likelihood. There's been no allegation of procedural or factual defect. It's just a disagreement. Well, what the letter says is that medical providers may submit a non-formulary request pending approval of the request. Well, who approves the request? Medical providers provide the request. Who's the approver? The central office. Beyond that, I don't know. The central office of what? The BOP. The Bureau of Prisons. Are those medical providers? It would be imprudent for them in a medical determination to not have a medical opinion when they make that decision. Why is approval required then? What was that, Your Honor? Why is approval required? I would assume because it's off the formulary, so they have to approve the... Yes, I know, but medical providers have recommended this off the formulary drug. Now, according to this letter, this has to be approved. And you say it has to be approved by the central office of the Bureau of Prisons. My question is, are the people in that office, are they doctors? I don't know the answer to that question. If they're not doctors, I'm not sure on what basis they approve, except they might be very worried about the amount of money. If that were the case, Your Honor, nilatribine would never have been provided, and as the letter goes on, it specifically states that it has been provided in the past with persons' medical conditions very similar to Mr. Rothbard. All that information was before the district court and specifically relied upon the district court, not once but twice. How often has it been provided? That information was not provided to us. You don't have a lot of information in this record. Okay, any other questions? No. All right, thank you very much, Mr. Shepard. Thank you, Your Honor. And I think you have a little bit of time, Mr. Garcia. Thank you, I'll be brief, Your Honor. First, with all due respect to Mr. Shepard, and I know he is busy, we have no problem if this court so esponte issues expedited briefing. As I indicate on the record, we intend to have our brief done in the next seven days. There is no evidence in the record to contradict Dr. Cripes' statement, and I will note that the standard of care pursuant to Dr. Cripes' affidavit is that he received uninterrupted treatment with the nilatrib. Yes, there are other drugs that are available. However, given Mr. Rothbard's individual response to the nilatrib, he would recommend that that's what he continued to receive and that any interruption of that may likely result in a relapse or take him out of remission. And as he indicates in paragraph 12, if there is any type of inability for him to receive it, it's likely that he may die if it goes back into relapse. So, on balance, I certainly understand where the government is coming from with their argument, but on balance, we would ask this court to continue to stay. Thank you. All right. Thank you very much, Mr. Garcia. We will rule on this motion as soon as we can, and the court will be in recess. Thank you.